

**IT IS ORDERED as set forth below:**

**Date: September 14, 2020**

_____

**W. Homer Drake**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | | |
|---|---|---|
| **IN THE MATTER OF**: | : | **CASE NUMBERS** |
| | : | |
| ALTON WAYNE KNIGHT, | : | BANKRUPTCY CASE |
|     Debtor. | : | 15-11059-WHD |
| _____ | : | |
| | : | |
| BARBARA COOK, | : | ADVERSARY PROCEEDING |
| Administrator for Estate of Paul Cook, | : | 15-1042 |
| Deceased, | : | |
|     Plaintiff, | : | |
| | : | |
|     v. | : | |
| | : | |
| ALTON WAYNE KNIGHT, | : | IN PROCEEDINGS UNDER |
|     Defendant. | : | CHAPTER 7 OF THE |
| | : | BANKRUPTCY CODE |

## <u>ORDER</u>

Paul H. Cook (hereinafter "Cook"), the Plaintiff's late husband, was a certified

public accountant practicing in Griffin, Georgia.  Cook and the Debtor were co-

members of AWKPHC, LLC (hereinafter the "LLC"), which did business as "Knight and Cook CPAs."   Cook died on July 28, 2013, and Barbara Cook (hereinafter the "Plaintiff") became administrator of his estate.   A disagreement arose between the Debtor and the Plaintiff concerning the ownership and disposition of Cook's client list and his interest in the LLC.   Per the LLC's operating agreement (hereinafter the "Agreement"), the parties submitted their dispute to arbitration.

The arbitrator held his hearing on February 15, 2015, and, on March 15, 2015, entered an award totaling $223,006.25 in favor of the Plaintiff and against the Debtor.   Specifically, the award directs the Debtor to pay the following: (1) $150,000 for Cook's client base to be paid either immediately or in four equal payments, as chosen by the Debtor; (2) $45,000 representing Cook's capital and other interests in the LLC to be paid immediately; and (3) $17,000 in partial attorney's fees, and $11,006.25 as the Plaintiff's share of the costs of arbitration.

The Debtor filed the above-styled Chapter 7 petition on May 18, 2015.   On August 24, 2015, Plaintiff filed a complaint to determine dischargeability under § 523, an objection to discharge under § 727, and an award for attorney's fees pursuant to O.C.G.A. § 13-6-11.

On April 18, 2017, the Plaintiff filed a motion for summary judgment, seeking

judgment on all counts of her complaint. Shortly thereafter, the Debtor filed his own motion for summary judgment, seeking judgment as to Count 3 of the Plaintiff's complaint. On August 24, 2017, the Court entered its order on the cross motions for summary judgment, granting judgment for the Debtor on the Plaintiff's objection to discharge under § 727. The Court denied summary judgment on the remaining counts of the Plaintiff's complaint.

## Issues Presented

The remaining issues came before the Court for trial, during which time both parties submitted evidence and presented witness' testimony. At that time, the Court declined to consider whether the Plaintiff is entitled to attorney's fees pursuant to O.C.G.A. § 13-6-11, choosing instead to address this issue subsequent to a determination on the dischargeability of the debt. Accordingly, the Court now presents its findings of fact and conclusions of law on the following issues:

1. Whether the Debtor's debt to the Plaintiff is nondischargeable pursuant to § 523(a)(4); and

2. Whether the Debtor's debt to the Plaintiff is nondischargeable pursuant to § 523(a)(6).

## Findings of Fact and Summary of Evidence[1]

1. Cook and the Debtor practiced tax accountancy together as the principals of the LLC for several years.

2. The LLC operated in accordance with its Agreement, which governs the allocation of fees and expenses between the Members, as well as Member's draws.   The LLC's model was described as an "eat what you kill" model, meaning that expenses were deducted from each Member's gross revenue on a monthly basis, with the net revenue being credited to each Member's capital account.   A Member could draw from the capital account so long as the draw did not result in his capital account being in a deficit, since overdrawing one's capital account meant that a Member had drawn on another Member's funds.

3. The Agreement also provides that each Member owns personally his client base, and that the other Member will act in good faith by refraining from directly soliciting the other Member's clients.[2]   It further requires the

---

[1] In its order on the parties' motions for summary judgment, the Court held that it would treat the conclusions of the arbitrator as established.   Thus, the Court incorporates those conclusions in this opinion.

[2] Section 5.2, Member's Client Base: Each member has his or her own client base. Members retain personal ownership of their client base.   Each member may add, or remove clients from their client base at will. Each member will act in good faith

liquidation of the LLC upon the occurrence of an event that causes there to be only one Member,[3] and that, upon the occurrence of such an event, any further operations of the LLC shall be for the purpose of effectuating an orderly liquidation.[4]

4. Client transfers did occur between Members of the LLC. These transfers were for consideration, with the customary amount paid being the annual gross revenue that client had produced, with this amount typically being paid over a period of three to five years.

5. Prior to Cook's passing, both the Debtor and Cook expressed interest in selling their respective client lists and the LLC in its entirety.

---

by refraining from directly soliciting another Member's client(s). However, upon mutual agreement, and consideration paid, one Member may transfer his client(s) to another member's client base at will. A member may transfer his client base or any part thereof to another CPA at will." Agreement § 5.2.

[3] Section 15.1, Liquidating Events: The [LLC] shall dissolve and commence winding up and liquidation upon the first to occur of any of the following "Liquidating Events"… (c) any event, which causes there to be only one Member. Agreement § 15.1(c).

[4] Section 15.2, Winding Up: Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members. No Member shall take any action that is inconsistent with, or not necessary or appropriate for, winding up the [LLC]'s business and affairs." Agreement § 15.2.

6.  The Debtor, acting on behalf of himself and Cook, participated in sale negotiations with several interested third-party CPAs.  Particularly, the Debtor participated in numerous discussions with a Mr. Hammonds, who was interested in purchasing both the Debtor's and Cook's client lists.

7.  In the discussions with Mr. Hammonds, the Debtor and Cook indicated that they were both amenable to remaining in practice for a designated period of time after a purchase in order to provide transition services and good will to the purchaser.

8.  Cook passed away on July 28, 2013, prior to the finalization of a sale.

9.  In early August 2013, the Plaintiff met with the Debtor, and they agreed that the Debtor would collect Cook's outstanding receivables, bill for his unbilled services, and attempt to find a CPA-purchaser for both Cook's clients and those of the Debtor.  They also agreed that the Debtor would complete for Cook's clients the extended tax returns that were coming due in October 2013.

10. The Debtor suggested, and the Plaintiff concurred, that a "comfort letter" be sent promptly to Cook's clients stating that the Debtor and the LLC would file their extended tax returns then pending and handle any other future tax accountancy need they might have.   The Debtor represented, and the Plaintiff

believed, that the purpose of this letter was to preserve Cook's client base in preparation for a future sale.

11. Both parties recognized that an expedient sale of Cook's client list was necessary, since its value was decreasing rapidly with the passage of time.

12. The Plaintiff's intention was to sell Cook's client list as quickly as possible.

13. In August 2013, the Plaintiff requested that the Debtor provide her with a copy of Cook's client list.   The Debtor informed the Plaintiff that she must acquire letters of administration in regard to Cook's estate before the Debtor could provide Cook's client list to her.

14. The Plaintiff received the letters of administration in October 2013.

15. During this time, the Plaintiff repeatedly asked the Debtor for financial information on Cook's practice and that of the LLC, as well as for a copy of Cook's client list.

16. The Plaintiff informed the Debtor of interest of a certain third-party CPAs in purchasing all of Cook's client base.

17. The Debtor, for whatever reason, refused to deliver the client list and financial information to the Plaintiff.

18. In November 2013, the Debtor, despite his earlier assurances to the contrary,

informed the Plaintiff that he had decided not to sell his client base, that he was not attempting to sell Cook's client base to a third-party CPA, and claimed that the LLC owned Cook's client base.  The Debtor also informed the Plaintiff that he would not give her the funds in Cook's capital account unless she withdrew from the LLC.

19.  Later that month, the Debtor, in a letter to the Plaintiff, stated that he intended to present an engagement letter to all of the LLC's clients for future engagements.

20.  At the beginning of December 2013, the Plaintiff retrieved a copy of Cook's client list from the LLC's office, with the help of one of Cook's former assistants, Ms. Floyd.   There were concerns that this list was not complete.

21.  Later that month, the Debtor offered to provide the Plaintiff with a copy of Cook's client list.  However, the turnover of the client list was contingent upon the Debtor, through the LLC, being allowed to solicit Cook's clients. The proposal made no mention of any compensation to the Plaintiff for any of Cook's clients.   The Plaintiff declined the offer.

22.  During this time, the Debtor continued to bill Cook's capital account for the following: various overhead expenses of the firm; a tax penalty assessed for a

late filing of the LLC's tax return that was not due until after Cook's death; and for half of the tax software to be used solely by the Debtor.

23. In February 2015, the parties submitted their disputes to arbitration.   At this time, the Debtor retained, through the LLC, substantially all of Cook's clients' tax work. Moreover, the Debtor paid only $2,800 to the Plaintiff out of Cook's estate's share of the LLC, while paying himself $75,000 and other amounts from the LLC.

24. The arbitrator found the following: that the Debtor caused the LLC to pay his legal counsel's fees in the arbitration, as well as his other personal expenses; that he refused to account for funds of both the LLC and for sums belonging to Cook's estate from the LLC; and, that he refused to liquidate the LLC, despite the Agreement requiring its liquidation upon the death of one of the two Members.

25. The arbitrator concluded that the Debtor violated his duties under the Agreement and under Georgia law, that he had not dealt in good faith with the Plaintiff, that he had converted for his own benefit Cook's client base, and that he had not paid the Plaintiff the amounts due to her from the LLC.

26. On March 15, 2015, the arbitrator entered the award, directing the Debtor to,

*inter alia*, pay the Plaintiff $150,000 with respect to Cook's client base, now being serviced by the Debtor, and that he pay immediately to the Plaintiff $45,000, representing Cook's capital and other interests in the LLC.

27.  Subsequent to the entry of the arbitrator's award, the Debtor withdrew from the LLC $50,000 as a personal draw, as well as $5,000 to compensate his bankruptcy counsel.

28.  The Debtor filed the Chapter 7 petition on May 18, 2015.

29.  At the time of the petition filing, the Debtor had made no payments to the Plaintiff in accordance with the arbitration award, and he had paid to the Plaintiff only $2,800 out of Cook's interest in the LLC.

### Conclusions of Law

"A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition."  *In re Mitchell*, 633 F.3d 1319, 1326 (11th Cir.2011) (citing 11 U.S.C. § 727(b)).  However, "this 'fresh start' policy is only available to the 'honest but unfortunate debtor.'"  *Id.* (quoting *In re Fretz*, 244 F.3d 1323, 1326 (11th Cir.2001)).  "To ensure that only the honest but unfortunate debtors receive the benefit of discharge, Congress enacted several exceptions to § 727(b)'s general rule of discharge."  *Id.*

Courts narrowly construe exceptions to discharge against the creditor and in favor of the debtor.   *E.g., Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301 (11th Cir.1994); *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 680 (11th Cir.1993).   A creditor has the burden of proving the availability of an exception to discharge by a preponderance of the evidence.   *E.g., Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L.Ed.2d 755 (1991).

The Plaintiff seeks to have the debt excepted from discharge according to § 523(a)(4) and (a)(6).   The arbitrator's award provides three distinct bases of recovery: (1) an award for the client list in the amount of $150,000, (2) an award for Cook's estate's share of the LLC in the amount of $45,000, and (3) an award for attorney's fees and arbitration costs in the total amount of $28,006.25.   The arbitration award totals $223,006.25 in favor of the Plaintiff.   The Court will consider the applicability of § 523(a)(4) and (a)(6) to each, individually.

I.   Nondischargeability Under § 523(a)(4)

Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."   11 U.S.C. § 523(a)(4). The fiduciary relationship requirement applies only to fraud and defalcation, not embezzlement or larceny.   *See SmithKline Beecham Corp. v. Lam (In re Lam)*, 2008

WL 7842072. at *3 (Bankr. N.D. Ga. Mar. 27, 2008) (Diehl, J.).   As the Court has already determined that there is no evidence of the existence of any technical or express trust relationship, (*see* Court's Order on Parties' Motions for Summary Judgment, Doc. 38, p. 17), the Court's focus is on the embezzlement and larceny aspect of this § 523(a)(4), the definitions of which are determined under federal common law.   *SmithKline Beecham Corp. v. Lam (In re Lam)*, at *3.

"Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Bennett v. Wright (In re Wright)*, 282 B.R. 510, 516 (Bankr. M.D. Ga. 2002).   To establish embezzlement, the plaintiff must show (1) property owned by another that is rightfully in the possession of the debtor; (2) the debtor appropriates the property for personal use; and (3) the appropriation occurred with fraudulent intent. *Sandalon v. Cook (In re Cook)*, 141 B.R. 777, 780 (Bankr. M.D. Ga. 1992).   Larceny is a felonious taking of property with the intent to convert it or permanently deprive the owner of it without the owner's consent, *Matter of Burgess*, 106 BR 612, 622 (Bankr. D. NE. 1989).   Larceny does not apply to situations in which the debtor obtained the property lawfully.   Thus, embezzlement and larceny differ only with respect to the manner in which the funds or property came into the debtor's

possession.

Importantly, both embezzlement and larceny require a showing of fraudulent intent or deceit on the part of the debtor. *SmithKline Beecham Corp. v. Lam (In re Lam)*, at *3 (citing *In re Weber*, 892 F.2d 534, 538 (7th Cir.1989)). "An intent to defraud is defined as 'an intention to deceive another person, and to induce such other person, in reliance upon such deception to assume, create, transfer, alter or terminate a right, obligation or power with reference to property.'" *In re Trexler*, WL 236054, at *8 (Bankr. N.D. Ga. Jan. 11, 2016) (citation omitted). "Intent is a state of mind which may be interpreted by the conduct of the person implicated." *Id*;

Fraudulent intent may be shown by circumstantial evidence. *In re Fox*, 370 B.R. 104, 116 (6th Cir. BAP 2007). Courts consistently find that concealment on the part of a debtor is evidence of fraudulent intent. *In re Trexler*, WL 236054, at *8. Additionally, a lack of consistency or lack of credibility in a debtor's testimony, as well as a perceived lack of truthfulness in testimony, can be indicative of fraudulent intent. *Id.* at *9. Notwithstanding, evidence of a debtor's reliance upon the advice of legal counsel tends to negate finding the intent necessary for embezzlement or larceny. *In re Cloninger*, 548 B.R. 839, 859 (Bankr. N.D. Ga. 2016), aff'd sub nom. *Cloninger v. Cloninger*, 2017 WL 11496867 (N.D. Ga. Oct.

24, 2017).

Ultimately, the Court is to take into consideration the totality of the circumstances in its determination as to fraudulent intent.  *In re Trexler*, at *8.

A.   The Award for the Client List

The arbitrator concluded that the Debtor "converted for his own benefit" Cook's client base.   Conversion involves conduct similar to that required for embezzlement and larceny, namely, the wrongful exercise of control over property of another. *See, e.g., Parks v. Multimedia Techs Inc.,* 520 S.E.2d 517, 525 (Ga. Ct. App. 1999) ("Conversion is the unauthorized assumption and exercise of ownership over the personalty of another…contrary to the owner's rights.").   However, a finding of conversion does not necessarily result in a finding of nondischargeability under § 523(a)(4), since conversion lacks any intent requirement.   *See Ryan v. Reynolds (In re Reynolds)*, 2006 WL 6592050, at *3 (Bankr. N.D. Ga. Apr. 6, 2006). Here, the Court finds that the arbitrator's finding of conversion obviates the need for the Court to address anything other than whether the Debtor possessed the fraudulent intent necessary for a finding of nondischargeability under § 523(a)(4).

Upon consideration of the evidence presented, the arguments of the parties, and the totality of the circumstances, the Court finds that the Debtor possessed the

fraudulent intent necessary for a finding of nondischargeability pursuant to §

523(a)(4).   There are several reasons for this.

First, the Debtor's withholding of the client list from the Plaintiff was without

justification and is evidence of fraudulent intent.   Despite the Plaintiff's having

obtained the letters of administration, the Debtor still refused to turn over the client

list.   The Debtor's only explanation for this refusal is that the Plaintiff already had

a copy of the list, and that the list he would have provided to her was identical to the

one that she had already acquired.   This explanation, however, is not adequate, as it

does not explain the Debtor's refusal to provide the list during the months prior to

the Plaintiff's acquisition of the list in December 2013.   Further, the Debtor's

testimony that the lists were identical is undermined by evidence showing that the

list eventually provided by the Debtor to the Plaintiff contained substantially more

clients than the list first obtained by the Plaintiff.   Further, the Court is not swayed

by the Debtor's offer to provide the client list and the Plaintiff's subsequent refusal

of the offer, since the Debtor's turning over of the client list was contingent upon his

being allowed to solicit Cook's clients without any mention of compensation to the

Plaintiff.

Second, the Debtor's inconsistent testimony during trial is indicative of

fraudulent intent.   The Debtor's testimony, at many times, contradicts not only the evidence, but also his own prior testimony.   For example, the Debtor argues that he did not solicit Cook's clients, and he testified at trial to the same.   He argues further that he did not provide services to Cook's clients until they signed a form acknowledging that they had not been solicited by the Debtor.   *See* D. Ex. 25.   This position, however, is inconsistent with the Debtor's stated intentions and with the evidence presented.

The Debtor, in his November 2013 letter to the Plaintiff, stated that he was going to present an engagement letter to all of the LLC's clients.   Moreover, the Debtor provided no reasonable explanation for evidence indicating that he took action in regard to Cook's clients without the authority to do so.   For example, the Debtor was presented with email communications between himself and Ms. Floyd, Cook's former assistant, in which he instructs her "to call any of the clients you have contact with."   *See* P. Ex. 40.   The Debtor could provide no explanation for this. Instead, he argued that the email was fabricated in its entirety, ignoring the fact that it came from his email account and bore his name.

Similarly, Ms. Floyd, in another email, informed the Debtor that one of Cook's existing clients was opening a new restaurant location.   In response, the Debtor

instructed Ms. Floyd to set up that client under the Debtor's designated client identification number, rather than under Cook's client identification number. *Id.* When asked why he gave this directive, the Debtor again gave no explanation other than to argue that the email was fabricated. The evidence presented also shows that the Debtor contacted some of Cook's clients in order to either terminate the services provided to them or to inform them of an increase in the rate of those services. *See* P. Ex. 20.

Third, the Debtor's inconsistent positions in regard to ownership of the client list is evidence of fraudulent intent. The Agreement explicitly states that "Members retain personal ownership of their client base." Moreover, the evidence presented[5] and the Debtor's own testimony at trial is replete with instances in which the Debtor acknowledges that the client list of the individual member is property of that member. For example, when asked why he sent tax organizers to his clients, but not Cook's clients, the Debtor responded "because they are my clients." However, when asked about the Agreement providing that "[m]embers retain personal ownership of their client base," the Debtor responded that "we've always had a problem with that."

---

[5] Specifically, the Debtor's correspondence with potential purchasers.

Contradicting himself again, the Debtor, in his next statement, testified that Cook was free to sell <u>his</u> client list, since the Agreement allowed him to do so.

Fourth, while the Court does not find fraudulent intent in the Debtor's decision not to sell the LLC, the Court does find that his representations to the Plaintiff in this regard were not truthful.   The Debtor informed the Plaintiff in November 2013 that he was not going to sell his client list and that he was going to stay in practice for several more years.   However, the evidence shows that the Debtor, in December 2013, was still participating in discussions with a potential purchaser.   While this conduct alone may not satisfy a finding of fraudulent intent, it is dubious and duplicitous in nature, and, taken in conjunction with the Debtor's other actions, it supports the Court's finding of fraudulent intent.

Finally, the Court is troubled, specifically, by the Debtor's actions in regard to providing the identification of his counsel. In August 2013, the Debtor informed the Plaintiff's counsel that he had been instructed by his counsel not to provide the Plaintiff a copy of Cook's client list until she had acquired letters of administration. At trial, the Plaintiff's counsel testified that he made several subsequent requests to the Debtor that he provide the identity of his counsel in order for counsel from the parties to communicate with one another in regard to the parties' dispute.   However,

the Debtor did not respond to these requests.    Moreover, it appears that the Plaintiff's counsel's first communication with the Debtor's counsel occurred in December 2013.    In this communication, the Debtor's counsel states that "he has not been privy to the exchanges between the Debtor and [Plaintiff's counsel]."    P. Ex. 29, p. 62-3.    The Debtor provides no explanation for this.    Similar to the Debtor's duplicity in regard to his intent to sell the LLC, this conduct alone may not satisfy a finding of fraudulent intent, it is evidence of fraudulent intent.

Therefore, the Court finds that the totality of the circumstances supports a finding of fraudulent intent on the part of the Debtor as it pertains to Cook's client list.    Thus, the arbitrator's award in the amount of $150,000 in relation to the client list is excepted from discharge pursuant to § 523(a)(4).

### B.   The Award for Paul Cook's estate's share of the LLC

The Court finds that the award for Cook's estate's share of the LLC is excepted from discharge pursuant to § 523(a)(4).    The Court's determination is based on the following actions by the Debtor: his continuing to bill Cook's capital account for various overhead expenses well into 2014 and 2015, long after Cook's death; his billing Cook's capital account for a late filing tax penalty assessed for an LLC's tax return that did not come due until after Cook's death; and his billing Cook's capital

account in February 2014 for a half share of tax software to be used for the filing of the following years tax returns.

In those instances, the Debtor exercised control over the LLC, including Cook's capital account, as its sole remaining member.  The Debtor also actively prevented the Plaintiff from having access to Cook's capital account.  Taking advantage of this, the Debtor continued to charge Cook's capital account for expenses and fees long after Cook's death that were not attributable to Cook in any apparent way.  Through these actions, the Debtor increased his net income and personal financial gain, all while diminishing Cook's capital account, which caused an injury to the Plaintiff.  Moreover, as previously stated, the totality of the circumstances evidences that the Debtor possessed fraudulent intent, since he refused to account for funds of the LLC and to provide any financial documents regarding Cook's capital account to the Plaintiff.

Consequently, the Court finds that the award for Cook's estate's share of the LLC in the amount of $45,000 is excepted from discharge pursuant to § 523(a)(4).

II.   Nondischargeability Under § 523(a)(6).

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."   11 U.S.C.

§ 523(a)(6).   A creditor must show that the injury was both willful and malicious. An injury is "willful" if the debtor commits an intentional act, "the purpose of which is to cause injury or which is substantially certain to cause injury." *Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329, 1334 (11th Cir. 2012) (quotation omitted). A negligent or reckless injury is insufficient under § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 140 L.Ed.2d 90 (1998).   The use of another's assets without paying for it, under any set of circumstances, will, with substantial certainty, cause injury, and, is, thus, "willful" within the meaning of § 523(a)(6).   *In re Robustelli*, 430 B.R. 709, 734 (Bankr. N.D. Ga. 2010).

To show maliciousness under § 523(a)(6), a creditor must establish that the debtor's actions are "wrongful and without just cause[,] or excessive even in the absence of personal hatred, spite[,] or ill-will." *Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329, 1334 (11th Cir. 2012) (quotation omitted). *See also See also Digital Commerce, Ltd. v. Sullivan (In re Sullivan)*, 305 B.R. 809, 823 (Bankr. W.D. Mich. 2004) ("Malicious" means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent).   "A showing of specific intent to harm another is not necessary," *In re Jennings*, at 1334 (internal quotation marks and citation omitted).   Consequently, malice, for the

purposes of § 523(a)(6), "can be implied."   *In re Thomas*, 288 Fed. Appx. 547, 549 (11th Cir.2008); *Tusco Budget Outlet, Inc. v. Stustman (In re Stutsman)*, 163 B.R. 374, 376 (Bankr. N.D. Okla. 1993) (Malice is ordinarily inferred if the debtor "willfully disregarded the rights of a creditor, if the debtor possesses actual knowledge, or if it is reasonably foreseeable, that his conduct will result in injury to the creditor.").   A malicious injury occurs when a debtor obtains a benefit from property belonging to another without her permission and without paying for it.   *In re Robustelli*, 430 B.R. 709, 735 (Bankr. N.D. Ga. 2010).

A.   The Award for the Client List

The Court finds by a preponderance of the evidence that there was a willful and malicious injury from the Debtor to the Plaintiff in regard to Cook's client list. The Debtor's actions were willful and substantially certain to cause injury to the Plaintiff.   The arbitrator concluded that the Debtor converted for his own benefit Cook's client list.   Indeed, the Debtor, despite the Plaintiff's requests, willfully withheld the client list and exercised control over the clients in a manner inconsistent with the Plaintiff's wishes.   The use of another's asset without permission or compensation under any set of circumstances is certain to cause injury to the other party.   *In re Robustelli*, 430 B.R. 709, 735 (Bankr. N.D. Ga. 2010).   Further, the

Debtor was aware of both the Plaintiff's desire to sell the client list and of the existence of several potential purchasers.   He was also aware that the value of the client list was diminishing with the passage of time.   Yet, he continued to withhold the client list, directly hindering the Plaintiff's ability to sell the client list.

The Court also finds that the Debtor's conduct was malicious, since it was wrongful and without just cause.   The Debtor provides no explanation that makes his actions appear justifiable, even when viewed in the most favorable light.   The Court also finds none.   Consequently, the Court finds that the arbitrator's award in the amount of $150,000 in relation to the client list is excepted from discharge pursuant to § 523(a)(6).

### B.   The Award for Cook's Estate's Share of the LLC

The Court finds that the award for Cook's share of the LLC is excepted from discharge pursuant to § 523(a)(6).   The Court bases this determination on the Debtor's continued billing of Cook's capital account as described *supra*.   The Debtor intentionally used Cook's funds without permission, and, in so doing, the Debtor obtained a personal benefit at the expense of the Plaintiff.   Consequently, the Court finds that this is sufficient to satisfy § 523(a)(6).   *See In re Robustelli*, 430 B.R. 709, 735 (Bankr. N.D. Ga. 2010).

**Conclusion**

Therefore, in accordance with the foregoing, it is hereby **ORDERED** that:

(1) the debt owed to the Plaintiff by the Debtor is excepted from discharge under both § 523(a)(4);

(2) the debt owed to the Plaintiff by the Debtor is excepted from discharge under both § 523(a)(6); and

(3) on a date determined by subsequent Order and Notice, the Court shall hold a hearing as to Count 4 of the Plaintiff's complaint, whether the Plaintiff is entitled to attorney's fees pursuant to O.C.G.A. § 13-6-11.

The Court reserves the right to make any additional findings and conclusions as may be necessary or as requested by any party.

The Clerk is **DIRECTED** to serve this Order on the parties, their respective counsel, the Chapter 7 Trustee, and the United States Trustee.

**END OF DOCUMENT**